UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X

CHARLES A. KISEMBO, JOSEPH SKABOWSKI,
and DAVID VAN LEUVEN,

                                        Plaintiffs,


                -against-                                    **COMPLAINT**
                                                            Civil Action No.
                                                            Demand for Jury Trial

THE NYS OFFICE OF CHILDREN AND FAMILY                       1:17-CV-354 [DNH/DJS]
SERVICES, GLADYS CARRION, SHEILA J. POOLE
ROBERTO VELEZ, JOHN DIXON,
FAROUK MALLICK, and GARY B. PATTMAN,
INDIVIDUALLY, and as AGENTS,
SERVANTS and/or EMPLOYEES of the
NYS OFFICE OF CHILDREN AND FAMILY SERVICES,

                                        Defendants

--------------------------------------------------------------------------X


                The plaintiffs, through their attorneys, Smalline and Harri, submit the following,

        as and for a complaint against the defendants, and allege as follows:


                                        **Introduction**


                1.    This is an action at law to redress the deprivation by the defendants, acting under

        color of statute, ordinance, regulation, custom and/or usage, of a right, privilege or

        immunity secured to the plaintiffs by the Fourth and Fourteenth Amendments to the

        Constitution of the United States of America by reason of depraved indifference, wanton

        disregard, and/or intent to deny the plaintiffs their civil rights, all of which arise under

Federal Law, particularly Title 42 U.S.C. Sec. 1983 and 1988, and the Constitution, Laws, and Statutes of the United States and the State of New York.

## Jurisdiction

2.     This action arises under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments to the Constitution of the United States and under Federal Law, particularly Title 42 of the United States Code, Sec. 1983 and 1988.

3.     This Court has jurisdiction of this case under and by virtue of Title 28 of the United States Code, Sec. 1331 and 1343.  Jurisdiction of the New York State common law claims arise from the pendent jurisdiction of this Court.

## The Parties

4.     The plaintiff Charles A. Kisembo ("Charles") was and is at all relevant times herein a resident of the County of Columbia, State of New York, and is employed as a Youth Division Aide 4 ("Aide") by the defendant New York State Office of Children and Family Services ("OCFS") at the Brookwood Secure Center ('Brookwood") located in Claverack, New York.

5.    The plaintiff Joseph Skabowski ("Joseph") was and is at all relevant times herein a resident of the County of Columbia, State of New York, and is employed as an Aide by OCFS at Brookwood.

6.    The plaintiff David Van Leuven ("David") was and is at all relevant times herein a resident of the County of Columbia, State of New York, and is employed as an Aide and a Training Coordinator at Brookwood.

7.    The defendant OCFS is an agency of the State of New York, which is responsible for the operation of Juvenile Secure Centers in New York State, such as Brookwood.

8.    The defendant Gladys Carrion ("Carrion") was and is at all relevant times herein a resident of the State of New York and was the Commissioner, employee, agent and/or servant of the defendant OCFS.

9.    The defendant Sheila J. Poole ("Poole") was and is at all relevant times herein a resident of the State of New York and currently is the Acting Commissioner, employee, agent and/or servant of the defendant OCFS.

10.    The defendant Roberto Velez ("Velez") was and is at all relevant times herein a resident of the State of New York and was the former Commissioner, employee, agent and/or servant of the defendant OCFS.

3

11.    The defendant Farouk Mallick ("Mallick") was and is at all relevant times herein a resident of the State of New York and was the former Acting Director of Brookwood, and is the current Associate Commissioner and the employee, agent, and/or servant of the defendant OCFS.

12.    The defendant John Dixon ("Dixon") was and is at all relevant times herein employed in the State of New York and was the Director of Brookwood, and the employee, agent, and/or servant of the defendant OCFS.

13.    The defendant Gary B. Pattman ("Pattman") was and is at all relevant times herein a resident of the State of New York and is the Director of Brookwood, and the employee, agent and/or servant of the defendant OCFS.

14.    The defendants were charged with the custody of the "residents" of Brookwood in Columbia County, New York, sometimes referred to herein as "Juvenile Inmates," and further responsible for the creation and implementation of Policies and Procedures regarding the interactions between the Aides and the Juvenile Inmates.

15.    Each and all of the acts of the defendants alleged herein were done by the defendants, and each of them, under color of law, to wit, under the color and pretense of statutes, ordinances, regulations, customs, policies, and usages of the State of New York.

4

16.   At all relevant times herein, the defendants were acting within the scope of their employment and under color of state law.

17.   The plaintiffs sue each of the defendants in his, her, or its individual capacity.

### Facts

18.   On or about February 27, 2007, OCFS, under the direction of then Commissioner Carrion, replaced the existing Policies and Procedures regarding the use of physical restraint of Juvenile Inmates with new Policies and Procedures (the "Protocol") intended to limit the use of restraint to circumstances when all mandated, proactive, non-physical, behavioral management techniques have been tried and failed.

19.   In addition, the Protocol also mandated that when the use of physical restraint is necessary, the staff shall employ only the mandated minimum amount of physical control necessary to stabilize the Juvenile Inmate in a dangerous or violent situation.

20.   Examples of initial proactive non-physical behavioral management techniques ("NPBM") to be used prior to physical restraint include: (i) pleasant imagery; (ii) counting backwards; (iii) deep breathing; and (iv) counseling, not using "touch controls" when addressing, confronting, or directing Juvenile Inmates, such as tapping or prodding or as an incidental gesture, holding a Juvenile Inmate's face to achieve eye contact, or placing a

5

hand on the Juvenile Inmate while confronting him or her, no staff may place their hands on a Juvenile Inmate in gestures such as touching the shoulder or pointing in the face when attempting to de-escalate a situation.

21.    The Protocol, which later came to be known as the "therapeutic" or "sanctuary" model of dealing with Juvenile Inmates, is inappropriate to control a population which includes male individuals up to the age of 21 years old, and therefore often physically mature, with known violent criminal histories, including assault and murder, some with violent gang affiliations, thereby often requiring immediate, forcible restraint to prevent them from inflicting life threatening assaults upon the staff, specifically the plaintiffs herein.

22.    Upon information and belief, both prior to and after institution of the Protocol, some of the male Juvenile Inmates with physical maturity and violent criminal histories posed a danger and threat equivalent to inmates with comparable backgrounds in County Jails and State Prisons.

23.    Upon information and belief, it was and is within acceptable and recommended County Jail and State Prison control procedures for the guards to be equipped with various deterrent devices, and under certain circumstances, physical restraint when threatened with violent assault.

24.     Before the change in the Protocol, the Aides in the Juvenile Secure Centers, such as Brookwood, while lacking deterrent devices, were at least allowed to use decisive measures to physically restrain the Juvenile Inmates when in imminent danger of violent assault.

25.     Once the Protocol was implemented in 2007, the Aides were stripped of even the existing bare minimum ability to defend themselves against the Juvenile Inmates and were no longer allowed to use decisive measures to physically restrain them when in imminent danger of violent assault.

26.     Instead the Protocol mandated that the Aides first implement the NPBM techniques as outlined above to attempt to non-physically stave off attack.

27.     This Protocol has promulgated a culture of predatory behavior on the part of certain violent Juvenile Inmates, who have become intimately aware of the limitations placed upon the Aides in defending themselves from unprovoked assaults that are intended to cause injury or death.

28.     In turn, implementation of the Protocol has caused a culture of trepidation and fear among the Aides, and more particularly the plaintiffs herein, as a result of the Juvenile Inmates' multiple and repeated violent assaults upon them, and their inability to defend themselves.

29.    In conjunction with, and in furtherance of, the constitutional deprivation caused by the aforementioned faulty Protocol, the defendants further failed to institute adequate policies, customs, and practices regarding safe levels of staffing.

30.    The aforementioned inadequate staffing, in conjunction with the Protocol requiring initial NPBM techniques, acted synergistically to constitute this potentially lethal deprivation of the constitutional rights of the plaintiffs.

31.    As a further reduction in staff safety support, the Special Services Unit Staff (the "SSU") at Brookwood, which had previously been stationed in common areas and hallways to respond to crisis situations and assist in all movements in the hall, were eliminated and assigned to individual units, leaving the hallways and common areas unprotected.

32.    In conjunction with, and in furtherance of, the constitutional deprivation caused by the aforementioned faulty Protocol and inadequate policies regarding staffing, the defendants further failed to institute appropriate policies, customs, and practices regarding discipline, deterrence, and security of Juvenile Inmates who have committed assaults in secure facilities operated by OCFS, such as Brookwood.

33.    Prior to 2007, if a Juvenile Inmate assaulted an Aide, he would immediately be moved to a modified special program ("MSP") for a thirty-day period, in which there

would be 24-hour supervision and he would be escorted from his unit for school, recreation, and medical care only.

34.    Upon information and belief, the aforementioned consequences for committing assault served not only as a deterrent of future transgressions, but ensured that during this period of violent escalation, no additional Aides would be exposed to the Juvenile Inmate without additional staff support.

35.    After 2007 through the present, there is no such procedure for set consequences or heightened security and supervision of a Juvenile Inmate whose behavior has escalated to assault, leaving the Aides vulnerable to further attack.

36.    Upon information and belief and by way of example, the Juvenile Inmate who brutally assaulted two of the plaintiffs during the month of December 2016 without being subjected to any meaningful method of discipline or deterrence, subsequently assaulted the Director of Brookwood, the defendant Pattman, and only then was removed from Brookwood and transferred to Columbia County Jail.

37.    In addition to the aforementioned, the defendants further put the safety and well-being of the Aides at risk by failing to abide by the regulations of the Public Employee Safety and Health Bureau ("PESH") relating to the proper preparation and filing of incident reports involving physical violence against the Aides as under its workplace safety regulations.

38.    Most recently, in or about 2016, and in further deprivation of the constitutional rights of the plaintiffs, the physical restraint restrictions of the Protocol were further restricted to supine or sitting or standing positions causing the Aides to be even more vulnerable to Juvenile Inmate attack and injury.

## A. FACTS PERTAINING TO CHARLES

39.    On December 11, 2016, the plaintiff Charles, a 60-year old male weighing 180 pounds, had been working for the OCFS, formerly known as Division for Youth, for twenty years.

40.    Accordingly, Charles had been trained and was experienced in all the procedures instituted by OCFS with regard to supervision, counseling, control, and, when necessary, restraint of Juvenile Inmates within the secure juvenile facilities such as Brookwood.

41.    On December 10, 2016, Charles arrived at the Brookwood facility at 10:00 p.m., for his shift from 10:15 p.m. to 6:30 a.m.

42.    That evening, he was in charge of doing all the laundry for the residents, acted as a SSU staff, and was assigned to a Unit as a second staff.

43.    Upon information and belief, the first shift was completed without incident.

44.    Charles' second shift began on December 11, 2016 at 6:30 a.m., and he was assigned as a SSU staff, kitchen dining room staff, and medical round staff.

45.    At approximately 8:00 a.m., Charles began medical rounds with the nurse.

46.    At approximately 11:00 a.m., the Duty Officer ("DO") and medical staff asked Charles to escort three Juvenile Inmates, one at a time, to the medical department.

47.    Upon information and belief, the first of these Juvenile Inmates to be escorted, Juvenile Inmate # 1, was on a safety watch.

48.    Charles first encountered Juvenile Inmate # 1 on Wing 8, where he was with a staff member.

49.    Upon information and belief, Juvenile Inmate # 1 is approximately 6 feet tall, weighs approximately 200 pounds, and is known to have committed multiple prior assaults of Aides at Brookwood.

50.    Upon information and belief, Juvenile Inmate # 1 appeared compliant, at which time Charles and the staff member began escorting him to medical.

51.    The route from Wing 8 to medical includes a single, enclosed hallway of approximately 200 feet.

52.    Prior to the 2016 change, when SSU staff were removed from the hallways, there would have been at least three SSU staff in the hallway at all times for safety and security to assist in the escort of Juvenile Inmates, holding doors, and responding to crises during movement to and from the Units.

53.    At the time of Charles' escort of Juvenile Inmate # 1 to medical, there were no SSU staff in the hallway.

54.    When Charles, Juvenile Inmate # 1, and the staff member had walked approximately one-quarter of the way down the hallway, Juvenile Inmate # 1 grabbed a pair of wet floor signs and called out Charles' name.

55.    Upon information and belief, when Charles turned around, Juvenile Inmate # 1 had the yellow wet floor signs in his hands.

56.    In accordance with the Protocol and in an effort to de-escalate the situation in a non-physical manner, Charles asked Juvenile Inmate # 1 to put the signs down.

57.    Juvenile Inmate # 1 ignored Charles' plea and brutally assaulted him by swinging the wet floor sign at his forehead.

58.    Upon information and belief, had Charles encountered this situation prior to the institution of the Protocol, he would have immediately physically disarmed Juvenile Inmate # 1, protecting himself by preventing the near-fatal assault.

59.    As a result of the assault, Charles was shocked and dazed, blood began gushing out of his head and down his face and clothes, and he collapsed to the floor.

60.    Charles was beginning to feel cold, staff eventually responded, looking at him in shock and horror at what had happened.

61.    Charles told the DO that he was feeling cold, he was given a blanket, medical responded, then Charles lost the ability to speak.

62.    The rescue workers arrived and started hooking up IV lines, telling Charles to stay with them. They lifted him onto the stretcher, and moved him to the ambulance.

63.    Upon information and belief, the rescue workers intended on sending him to the trauma unit at Albany Medical Center via helicopter, but were unable to secure transport, so he had to be transported via ambulance.

64. In the ambulance, Charles' body went into spasms, froth was coming from his mouth, he lost consciousness, regaining it at AMC, as he saw his wife and realized he was alive.

65. As a result of the brutal, near-fatal assault, Charles received twenty stitches on his forehead and now has a disfiguring scar, he experiences ringing in his ears, sleepless nights, repeatedly relives the situation, suffers from severe migraine headaches and neck pain, and has been treating with a psychologist for post-traumatic stress, a physical therapist for neck pain, and is scheduled for further treatment with a neurologist.

66. Since the brutal assault, Charles frequently losses energy and feels he is going to pass out, and is presently disabled from employment.

67. Prior to the December 2016 assault, Charles had been subjected to other assaults by various Juvenile Inmates which resulted in having his fingers broken, a tear of the soft tissue of the right hand, and a shoulder injury requiring surgery, all the while being deprived of the means to protect and defend himself.

68. During the period of 2007, when the Protocol was first instituted, thru to the aforementioned violent assault, the plaintiff Charles has been continuously subjected to a deprivation of his constitutional rights due to the constant trepidation, fear, and anxiety from working in an environment where he is under constant threat of physical harm or

threat of harm and had been subjected to prior assaults, and the aforementioned injuries, all the while being deprived of the means to protect and defend himself.

## B. FACTS PERTAINING TO JOSEPH

69.     The plaintiff Joseph, a 43-year old male weighing 227 pounds, has been working for the OCFS as an Aide since May 31, 1998.

70.     Accordingly, Joseph has been trained and was experienced in the aforementioned Protocol instituted by OCFS with regard to supervision, counseling, control, and when necessary restraint of Juvenile Inmates within the maximum security juvenile facilities.

71.     On December 31, 2016, Joseph arrived at the Brookwood facility at 6:15 a.m. for a pre-shift briefing.  At 6:30 a.m., he began working on Wing 11.

72.     Sometime later in the morning, Juvenile Inmate # 1, the same resident who had brutally assaulted Charles just 20 days before and who was on Personal Safety Watch, came out of his room, walked down to the staff office, and Joseph instructed him to return to his room.

73.     Juvenile Inmate # 1 said I'm not going back to my room, I'm going to hit you.  He struck Joseph on the left side of his face, ear, and head.

15

74.    With the assistance of another staff member, Joseph placed him in a standing restraint.  SSU was notified, came in, and placed Juvenile Inmate # 1 in handcuffs and escorted him to his room.

75.    Joseph went to the emergency room.  He sustained an abrasion on the left side of his head and a concussion.

76.    On January 4, 2017, Joseph was asked to work in Wing 11, where on December 31, 2016 he previously had been assaulted by Juvenile Inmate #1.  Upon first encountering him again and hearing his voice, Joseph suffered an incidence of post-traumatic stress and became anxious, pale, and dizzy and sought treatment in the emergency room.

77.    On January 19, 2017, Joseph arrived at the Brookwood facility at 6:15 a.m. for a pre-shift briefing.  At 6:30 a.m., he began working on Wing 1.

78.    Sometime later in the morning, Juvenile Inmate # 2 came out of his room and used the bathroom.

79.    He went into the hopper room where the mop handles and brooms are kept on the Unit.  Joseph came out of the office, Juvenile Inmate # 2 said he was going to throw milk at him.

16

80.     Joseph explained to him that there will be consequences and he will be written up if he does. Juvenile Inmate # 2 threw milk at Joseph and spit on him and then ran into the bathroom.

81.     Joseph notified SSU and the DO of the incident. They arrived on the unit. Juvenile Inmate # 2 was escorted back to his room.

82.     A short time afterward, Joseph took Juvenile Inmate # 3 down to the activity room to start his program.

83.     Sometime later while Joseph was alone with Juvenile Inmate # 3 in the activity room, Juvenile Inmate # 3 took a broomstick from the corner, removed the stick from the broom, and sat at his desk holding the broomstick in a threatening manner.

84.     Then, Juvenile Inmate # 3 advised Joseph that he wanted to hit him with the broomstick.

85.     Joseph called the DO to the activity room. He talked to the resident, and as the DO was ready to leave the activity room, Joseph asked whether he was going to take the broomstick from him.

17

86.    The DO said "you want me to take the broomstick from him?"  The DO then left them alone.  After approximately five minutes, two staff members came in and took the broomstick from Juvenile Inmate # 3.

87.    On January 20, 2017, Joseph arrived at the Brookwood facility at 6:15 a.m. for a pre-shift briefing.  He talked to the DO and advised him of the threatening behavior of Juvenile Inmate # 2 on Wing 1 the day before.  These difficulties included assaultive behavior of throwing milk and spitting on him.

88.    Despite the fact that Joseph had documented and reported these difficulties, and in contravention of the safety guidelines, Joseph was assigned once again to Wing 1 and was told "you've been here long enough, figure it out."

89.    Sometime later in the morning, Juvenile Inmate # 2 asked to use the bathroom and then tried to assault him with a cup of urine in his hand.

90.    Joseph went into the staff office to isolate himself from Juvenile Inmate # 2 who had threatened him the day before and was now threatening to throw urine at him. Due to his behavior, Joseph called SSU and the DO to Wing 1, they arrived on the Unit, de-escalated the situation, and returned Juvenile Inmate # 2 to his room.

91.    A short time later, Juvenile Inmate # 3, who was over 6 feet tall and weighed more than 200 pounds, and who had been isolated from the other residents on the

Unit due to his prior history and behavior with other Juvenile Inmates, came out of his room.

92.    Joseph took him to the activity room to start his program for the day, and he became agitated because of the unavailability of recreational programs.

93.    Juvenile Inmate # 3 then walked to the clock on the wall, took it down, and broke it on the table.  Joseph called the DO and asked him to come in. He asked Juvenile Inmate # 3 what can we do for you, how can we help you, what do you need?  Then an SSU staff came in.  Joseph stepped out into the hallway and they talked with Juvenile Inmate # 3 for a couple of minutes.

94.    Then Joseph returned to the room and the SSU staff and DO left.  Juvenile Inmate # 3 appeared very unstable.  Joseph took out his radio and held it in his hand due to Juvenile Inmate # 3's agitation, and attempted to calm him.  Juvenile Inmate # 3 then appeared to be in an uncontrollable rage, picked up several chairs and assaulted Joseph with them, and then punched him in the face.

95.    As a result of the traumatic assault, Joseph was taken by ambulance to the hospital where he was evaluated and treated for a concussion, neck pain, a lump on his left lip, back, leg, and knee injuries, marks on his chest, back, and neck, a sprained middle finger, agitation, anxiety, sleeplessness, and post-traumatic stress.  Joseph is presently disabled from employment.

96.    During the period of 2007, when the Protocol was first instituted, thru to the aforementioned violent assaults, the plaintiff Joseph has been continuously subjected to a deprivation of his constitutional rights due to the constant trepidation, fear, and anxiety from working in an environment where he is under constant threat of physical harm and had been subjected to prior assaults and the aforementioned injuries, all the while being deprived of the means to protect and defend himself.

## C. FACTS PERTAINING TO DAVID

97.    The plaintiff David, a 52-year old male weighing 280 pounds, has been working for the OCFS as an Aide since January 4, 2001, as well as a facility-based trainer since 2005.  On March 23, 2014, David became the facility trainer at Brookwood.

98.    In addition, David has acted as the Union Treasurer for the Civil Service Employees Association ("CSEA") since on or about 2008.  The CSEA collectively represents each of the plaintiffs in this action.

99.    Accordingly, David had been trained and experienced in the Protocol instituted by OCFS with regard to supervision, counseling, control, and, when necessary, restraint of Juvenile Inmates within the maximum secure juvenile facilities.

100.   On December 12, 2014, David arrived at the Brookwood facility at approximately 6:15 a.m. for a pre-shift briefing.  Up until 2:30 p.m., David conducted training.

101.   At 2:30 p.m., David began another training class for that shift.  At approximately 4:30 p.m., a social worker arrived in the training room and asked where the toys were for a visitor's child to play with.

102.   David left the training room to show her where they were.  As he walked into the hallway, a Unit was proceeding down the hallway to the large gym, approximately 7-10 Juvenile Inmates, two wing staff, and one SSU.

103.   One of the residents started arguing with the SSU staff.  David intervened using NPBT, i.e., counseling, to convince the Juvenile Inmate to proceed to the gym.

104.   The Juvenile Inmate then pushed the SSU staff who was also trying to counsel him, and David again attempted to intervene using NPBT.

105.   A second Juvenile Inmate grabbed him with a bear hug, and another resident, Juvenile Inmate # 4, hit David over the head, neck, and shoulder with a crutch.

106.    David attempted to gain control of him by putting him in a standing physical restraint, in response Juvenile Inmate # 4 continued to hit David with the other crutch, injuring his right wrist and arm.

107.    As a result of the violent assault, David was taken to the hospital where he was treated for a severe headache, blurred vision, and was later found to have sustained compressed and fractured vertebrae of the neck, resulting in pain and loss of movement.  In addition, David suffers from anxiety, sleeplessness, agitation, and post-traumatic stress.

108.    During the period of 2007, when the Protocol was first instituted, thru to the aforementioned violent assaults, the plaintiff David has been continuously subjected to a deprivation of his constitutional rights due to the constant trepidation, fear, and anxiety from working in an environment where he is under constant threat of physical harm or threat of harm and had been subjected to prior assaults and the aforementioned injuries, all the while being deprived of the means to protect and defend himself.

**AS AND FOR A FIRST CAUSE OF ACTION
AGAINST THE DEFENDANTS, THE PLAINTIFFS
STATE AND ALLEGE THE FOLLOWING:**

**Unconstitutional Custom, Practice or Policy**

*(Municipal Liability under* Monell)

109.    The plaintiffs repeat and reallege paragraphs 1 through 108 and incorporate the same by reference herein.

22

110.    Upon information and belief, the defendant OCFS, acting through Brookwood, by virtue of their custom, policy, and practice, as codified in the Protocol, acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs.

111.    Upon information and belief, in 2007, the Protocol was initially created and implemented by OCFS with deliberate and depraved indifference to the constitutional rights of the plaintiffs, and the Protocol has consistently been enforced despite continuous and growing evidence that the Protocol was ineffective and was subjecting the plaintiffs to increasing deprivation as the Juvenile Inmates became progressively aware of their vulnerabilities.

112.    The Protocol, which later came to be known as the "therapeutic" or "sanctuary" model of dealing with Juvenile Inmates, is inappropriate to control a population which includes male individuals up to the age of 21 years old, and therefore often physically mature, with known violent criminal histories, including assault and murder, some with violent gang affiliations, thereby often requiring decisive physical restraint to prevent them from inflicting life threatening assaults upon the staff, specifically the plaintiffs herein.

113.    This model has promulgated a culture of predatory behavior on the part of certain violent Juvenile Inmates, who have become intimately aware of the limitations placed upon the Aides in defending themselves from unprovoked assaults intended to cause injury or death.

114.    In turn, the model has caused a culture of trepidation and fear among the Aides, and more particularly the plaintiffs herein, as a result of the Juvenile Inmates' multiple and repeated violent assaults upon them, and their inability to defend themselves under the current model.

115.    Upon information and belief, the defendant OCFS, acting through Brookwood, was aware that the plaintiffs faced a special danger from the Juvenile Inmates, yet it affirmatively placed the plaintiffs in a situation without adequate policies or procedures to protect them.

116.    That the defendant OCFS, acting through Brookwood, thereby created and increased the danger that the plaintiffs were subjected to by Juvenile Inmates.

117.    That a special relationship existed between the plaintiffs and the defendant OCFS, acting through Brookwood, wherein the plaintiffs appropriately relied upon the Protocol created and implemented by the defendant which dictated the sole manner by which the plaintiffs could de-escalate and defend themselves against violent assaults by Juvenile Inmates.

118.    Upon information and belief, the conduct of the defendant OCFS, through Brookwood, shocks the conscience and constitutes depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs.

24

119.    Upon information and belief, the deliberate and depraved indifference of the

defendant OCFS, acting through Brookwood, in creating and maintaining the Protocol

caused the plaintiffs to suffer continuous constitutional deprivations and was a moving

force behind such constitutional deprivations.


120.    As a result of the aforesaid, the plaintiffs were caused to be subjected to the

deprivation of rights, privileges and/or immunities secured by the Constitution and laws of

this State and the United States and have been damaged thereby.  The rights, privileges and

immunities deprived by the defendants included, but are not limited to:


        a)     Right to due process of law;

        b)     Right to freedom from unlawful search and seizure;

        c)     Right to equal protection under the laws: and

        d)     Right to freedom from unlawful imprisonment.


121.    That as a proximate cause thereof, the plaintiffs suffered damages including,

but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation

and fear, and have incurred expenses for medical care, loss of income, and by way of the

deprivation of their constitutional rights.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS STATE AND ALLEGE
## THE FOLLOWING:

**Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983**

**Failure to Implement
Proper Protocol**

122.    The plaintiffs repeat and reallege paragraphs 1 through 121 and incorporate the same herein by reference.

123.    The actions by the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman affirmatively and significantly increased the risk of harm to the plaintiffs and the opportunities for the Juvenile Inmates to commit violent assaults upon them, by being aware of the adverse effect of the Protocol upon the Aides' ability to defend themselves and by failing to change, modify, or remove the existing Protocol, thereby depriving the plaintiffs of their constitutional rights.

124.    That the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman further deprived the plaintiffs of their constitutional rights by providing the Juvenile Inmates the means and opportunity to commit violent assaults upon them.

125.    That the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman further had a duty to the plaintiffs to protect them from the potential harm that the defendants created in the plaintiffs' work setting.

26

126.    Upon information and belief, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman were aware that the plaintiffs faced a special danger from the Juvenile Inmates, yet they affirmatively placed the plaintiffs in that situation without adequate policies and procedures to protect them.

127.    That the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman thereby created and increased the danger that the plaintiffs were subjected to with respect to violent assaults by Juvenile Inmates.

128.    That a special relationship existed between the plaintiffs and the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman wherein the plaintiffs appropriately relied upon the Protocol created and implemented by the defendants which dictated the sole manner in which the plaintiffs could de-escalate and defend themselves against violent assaults by the Juvenile Inmates.

129.    Upon information and belief, the conduct of the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman shocks the conscience and constitutes depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs.

130.    As a result of the aforesaid, the plaintiffs were caused to be subjected to the deprivation of rights, privileges and/or immunities secured by the Constitution and laws of this State and the United States and have been damaged thereby.  The rights, privileges and immunities deprived by the defendants included, but are not limited to:

    a)    Right to due process of law;

    b)    Right to freedom from unlawful search and seizure;

    c)    Right to equal protection under the laws: and

    d)    Right to freedom from unlawful imprisonment.

131.    Upon information and belief, the deliberate and depraved indifference of the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman in creating and/or maintaining the Protocol caused the plaintiffs to suffer continuous constitutional deprivations and was the moving force behind such constitutional deprivations.

132.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation and fear, and have incurred expenses for medical care, loss of income, by way of the deprivation of their constitutional rights.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS
## STATE AND ALLEGE THE FOLLOWING:

### Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983

### Failure to Institute Appropriate Protocol
### to Ensure Safe Staffing Levels

*(Municipal Liability under Monell)*

133.   The plaintiffs repeat and reallege paragraphs 1 through 132 and incorporate the same by reference herein.

134.   That upon information and belief, the defendant OCFS, acting through Brookwood, is responsible for establishing, instituting and enforcing effective policies, customs and practices as they relate to the staffing of employees, agents, and/or servants of secure facilities operated by OCFS, such as Brookwood.

135.   That upon information and belief, the failure of the defendant OCFS, acting through Brookwood, to institute and enforce effective policies, customs, and practices regarding staffing that would protect the physical safety of the Aides in the secure centers as it relates to the supervision and management of the Juvenile Inmates constitutes a deprivation of the plaintiffs' constitutional rights.

29

136.    This deprivation includes, but is not limited to, failure to institute any effective studies or surveys intended to monitor the ratio of non-administrative staff to residents.

137.    This constitutional deprivation in failing to institute and enforce adequate policies, customs, and practices regarding staffing, in combination with the failure to institute policies, customs, and practices that would allow effective restraint of Juvenile Inmates by Aides, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

138.    Upon information and belief, in so doing, the defendants OCFS, through Brookwood, acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs by failing to institute and enforce an effective policy, practice, or custom to adequately deal with staffing inequities.

139.    Upon information and belief, the deliberate and depraved indifference of the defendant OCFS, acting through Brookwood, in failing to institute and enforce an effective policy, practice, or custom with regard to employee staffing caused the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

140.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation

and fear, and have incurred expenses for medical care, loss of income, by way of the deprivation of their constitutional rights.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS
## STATE AND ALLEGE THE FOLLOWING:

### Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983

### Failure to Institute or Enforce
### Appropriate Protocol
### to Ensure Safe Staffing Levels

141.    The plaintiffs repeat and reallege paragraphs 1 through 140 and incorporate the same by reference herein.

142.    Upon information and belief, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman are responsible for establishing, instituting and enforcing the policies, customs and practices of OCFS and Brookwood as it relates to the staffing of employees, agents, and/or servants of secure facilities operated by OCFS, such as Brookwood.

143.    That the actions of the individual defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman in failing to institute and enforce effective policies, customs, and practices regarding staffing as it relates to the supervision and management of the Juvenile Inmates constitutes a deprivation of the plaintiffs' constitutional rights.

31

144.    This deprivation includes, but is not limited to, failure to institute any effective studies or surveys intended to monitor the ratio of non-administrative staff to residents.

145.    This constitutional deprivation in failing to institute and enforce effective policies, customs, and practices regarding staffing, in combination with the failure to institute policies, customs, and practices that would allow effective restraint of the Juvenile Inmates by the Aides, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

146.    Upon information and belief, in so doing, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs by failing to institute and enforce effective policies, customs, and practices to adequately deal with staffing inequities.

147.    Upon information and belief, the deliberate and depraved indifference of the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman in failing to institute and enforce effective policies, customs, and practices with regard to employee staffing caused the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

148. That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation and fear, and have incurred expenses for medical care, loss of income, by way of the deprivation of their constitutional rights.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS
## STATE AND ALLEGE THE FOLLOWING:

### Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983

### Failure to Institute Appropriate Protocol
### Regarding Discipline, Deterrence, and Security
### of Juvenile Inmates Who Have Committed Assaults

*(Municipal Liability under Monell)*

149. The plaintiffs repeat and reallege paragraphs 1 through 148 and incorporate the same by reference herein.

150. Upon information and belief, the defendant OCFS, acting through Brookwood, are responsible for establishing, instituting and enforcing its policies, customs and practices as they relate to the discipline, deterrence, and security of Juvenile Inmates who have committed assaults in secure facilities operated by OCFS, such as Brookwood.

151. Upon information and belief, the failure of the defendant OCFS, acting through Brookwood, to institute and enforce effective policies, customs, and practices regarding the discipline, deterrence, and security of Juvenile Inmates who have committed

33

assaults in secure facilities operated by OCFS, such as Brookwood, fails to provide for the safety of the Aides and constitutes a deprivation of the plaintiffs' constitutional rights.

152.    Prior to 2007, if a Juvenile Inmate assaulted an Aide, he would immediately be moved to a MSP for a thirty-day period, in which there would be 24-hour supervision and he would be escorted from his unit for school, recreation, and medical care only.

153.    Upon information and belief, the aforementioned consequences for committing assault served not only as a deterrent of future transgressions, but ensured that during this period of violent escalations, no additional Aides would be exposed to the Juvenile Inmate without proper staff support.

154.    After 2007 through the present, there is no such procedure for set consequences or heightened security and supervision of a Juvenile Inmate whose behavior has escalated to assault, leaving the Aides vulnerable to further attack.

155.    This is exemplified by the aforementioned brutal attack by Juvenile Inmate # 1 of the plaintiff Charles on December 11, 2016, followed by a separate brutal injury causing assault on the plaintiff Joseph by the same Juvenile Inmate just 20 days later on December 21, 2016, in the absence of any reasonable deterring consequences or stepped up security.

34

156.    This constitutional deprivation in failing to institute and enforce adequate policies, customs, and practices regarding discipline, deterrence, and security of Juvenile Inmates who have committed assaults in secure facilities operated by OCFS, such as Brookwood, in combination with the lack of protocol for staffing and effective restraint of Juvenile Inmates by Aides, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

157.    Upon information and belief, in so doing, the defendant OCFS, through Brookwood, acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs by maintaining a policy, practice, or custom that failed to adequately deal with discipline, deterrence and security of Juvenile Inmates who have committed assault in secure facilities operated by OCFS, such as Brookwood.

158.    Upon information and belief, the deliberate and depraved indifference of the defendant OCFS, acting through Brookwood, in failing to institute a policy, practice, or custom with regard to discipline, deterrence and security of Juvenile Inmates who have committed assaults in secure facilities operated by OCFS, such as Brookwood, caused the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

159.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation

and fear, and have incurred expenses for medical care, loss of income, by way of the

deprivation of their constitutional rights.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS
## STATE AND ALLEGE THE FOLLOWING:

### Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983

### Failure to Institute Appropriate Protocol
### Regarding Discipline, Deterrence, and Security
### of Juvenile Inmates Who Have Committed Assaults

160.    The plaintiffs repeat and reallege paragraphs 1 through 159 and incorporate

the same by reference herein.

161.    Upon information and belief, the defendants Carrion, Poole, Velez, Dixon,

Mallick, and Pattman are responsible for establishing, instituting and enforcing its policies,

customs and practices as they relate to the discipline, deterrence, and security of Juvenile

Inmates who have committed assaults in secure facilities operated by OCFS, such as

Brookwood.

162.    That upon information and belief, the failure of the defendants Carrion, Poole,

Velez, Dixon, Mallick, and Pattman to institute policies, customs, and practices regarding

the discipline, deterrence, and security of Juvenile Inmates who have committed assaults in

secure facilities operated by OCFS, such as Brookwood, fails to provide for the safety of

the Aides and constitutes a deprivation of the plaintiffs' constitutional rights.

36

163.    Prior to 2007 through the present, if a Juvenile Inmate assaulted an Aide, he would immediately be moved to a MSP for a thirty-day period, in which there would be 24-hour supervision and he would be escorted from his unit for school, recreation, and medical care only.

164.    Upon information and belief, the consequences for committing assault served not only as a deterrent of future transgressions, but ensured that during this period of violent escalations, no additional Aides would be exposed to the Juvenile Inmate without proper staff support.

165.    After 2007 through the present, there is no such procedure for set consequences or heightened security and supervision of a Juvenile Inmate whose behavior has escalated to assault, leaving the Aides vulnerable to further attack.

166.    This is exemplified by the aforementioned brutal attack by Juvenile Inmate # 1 of the plaintiff Charles on December 11, 2016, followed by a separate brutal injury causing assault on the plaintiff Joseph by the same Juvenile Inmate just 20 days later on December 21, 2016, in the absence of any reasonable deterring consequences or stepped up security.

167.    This constitutional deprivation of adequate policies, customs, and practices regarding discipline, deterrence, and security of Juvenile Inmates who have committed

assaults in secure facilities operated by OCFS, such as Brookwood, in combination with the lack of protocol for staffing and effective restraint of Juvenile Inmates by Aides, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

168.    Upon information and belief, in so doing, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs by maintaining a policy, practice, or custom that failed to adequately deal with discipline, deterrence and security of Juvenile Inmates who have committed assault in secure facilities operated by OCFS, such as Brookwood.

169.    Upon information and belief, the deliberate and depraved indifference of the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman in failing to institute a policy, practice, or custom with regard to discipline, deterrence and security of Juvenile Inmates who have committed assaults in secure facilities operated by OCFS, such as Brookwood, caused the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

170.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation and fear, and have incurred expenses for medical care, loss of income, by way of the deprivation of their constitutional rights.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS,**
**THE PLAINTIFFS**
**STATE AND ALLEGE THE FOLLOWING:**

**Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983**

**Failure to Comply with Public Employee**
**Safety and Health Bureau Protocols**
**Regarding the Reporting of Assaults**
**To the Detriment and Harm of the Plaintiffs**

*(Municipal Liability under Monell)*

171.    The plaintiffs repeat and reallege paragraphs 1 through 170 and incorporate the same by reference herein.

172.    That upon information and belief, the defendant OCFS, acting through Brookwood, are responsible for insuring compliance with PESH workplace safety regulations with respect to the proper completion and filing of incident reports involving physical violence against the Aides as under its workplace safety regulations.

173.    That upon information and belief, the customary and systemic failure of the defendant OCFS, acting through Brookwood, to ensure compliance with the aforementioned PESH regulations fails to provide for the safety of the Aides and constitutes a deprivation of the plaintiffs' constitutional rights.

174.    This constitutional deprivation in routinely failing to ensure compliance with the PESH regulations regarding workplace safety, and more specifically the proper

39

completion and filing of workplace violence forms following the assault upon the Aides, in combination with the lack of protocol for staffing, effective restraint of Juvenile Inmates by Aides, and failure to provide adequate policies, customs, and practices regarding discipline, deterrence, and security of Juvenile Inmates who have committed assaults in facilities operated by OCFS, such as Brookwood, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

175.    Upon information and belief, the depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs by the defendant OCFS, acting through Brookwood, in failing to ensure compliance with the aforementioned PESH regulations regarding workplace safety at the secure facilities operated by OCFS, caused the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

176.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation and fear, and have incurred expenses for medical care and loss of income, by way of the deprivation of their constitutional rights.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS,
## THE PLAINTIFFS
## STATE AND ALLEGE THE FOLLOWING:

### Denial of Civil Rights Pursuant to 42 U.S.C. Sec. 1983

### Failure to Comply with Public Employee
### Safety and Health Bureau Protocols
### Regarding the Reporting of Assaults
### To the Detriment and Harm of the Plaintiffs

177.    The plaintiffs repeat and reallege paragraphs 1 through 176 and incorporate the same by reference herein.

178.    That upon information and belief, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman are responsible for insuring compliance with PESH workplace safety regulations with respect to the proper completion and filing of incident reports involving physical violence against the Aides as under its workplace safety regulations.

179.    That upon information and belief, the failure of the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman to ensure compliance with the aforementioned PESH regulations fails to provide for the safety of the Aides and constitutes a deprivation of the plaintiffs' constitutional rights.

180.    This constitutional deprivation in failing to ensure compliance with PESH regulations regarding workplace safety, and more specifically the proper completion and filing of workplace violence forms following the assault upon the Aides, in combination with the lack of protocol for staffing, effective restraint of Juvenile Inmates by Aides, and failure to provide adequate policies, customs, and practices regarding discipline, deterrence, and security of Juvenile Inmates who have committed assaults in facilities operated by OCFS, such as Brookwood, acts synergistically together to constitute a potentially lethal deprivation of the constitutional rights of the plaintiffs.

181.    Upon information and belief, the defendants Carrion, Poole, Velez, Dixon, Mallick, and Pattman acted with depraved indifference, wanton disregard and/or intent to deny the constitutional rights of the plaintiffs in failing to ensure compliance with the aforementioned PESH regulations regarding workplace safety at secure facilities operated by OCFS, causing the plaintiffs to suffer continuous constitutional deprivations and was a moving force behind such constitutional deprivations.

182.    That as a proximate cause thereof, the plaintiffs suffered damages including, but not limited to, physical injuries, pain and mental suffering, embarrassment, humiliation and fear, and have incurred expenses for medical care and loss of income, by way of the deprivation of their constitutional rights.

## PRAYER FOR RELIEF

**WHEREFORE**, each plaintiff demands judgment against the defendants as follows:.

(a)  As and for their first cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants:

(b) As and for their first cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants:

(c) As and for their second cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants:

(d) As and for their second cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants:

(e) As and for their third cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants:

(f) As and for their third cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants:

(g) As and for their fourth cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants:

(h) As and for their fourth cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants

(i) As and for their fifth cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants;

(j)  As and for their fifth cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants:

(k) As and for their sixth cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants;

(l) As and for their sixth cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants;

(m) As and for their seventh cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants;

(n) As and for their seventh cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants;

(o) As and for their eighth cause of action, each of the plaintiffs demand compensatory judgment jointly and severally against the defendants;

(p) As and for their eighth cause of action, each of the plaintiffs demand punitive judgment jointly and severally against the defendants;

(q) Attorney fees for the plaintiffs' attorneys pursuant to 42 U.S.C. Sec. 1988: and

(r) Such other and further relief as this Court deems just, proper, and equitable.

The plaintiffs hereby demand a jury trial with respect to both liability and

damages

Dated: March 27, 2017

SMALLINE AND HARRI
Attorneys for Plaintiffs

By: _____

Martin D. Smalline
Bar Roll No. 507831
100 State Street, Suite 300
Albany, New York 12207
(518) 426-7750