UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHARLES A. KISEMBO,
JOSEPH SKABOWSKI, and
DAVID VAN LEUVEN,

                              Plaintiffs,


        -v-                                              1:17-CV-354

NYS OFFICE OF CHILDREN
AND FAMILY SERVICES,
GLADYS CARRION, Individually,
and as agents, servants and/or
employees of the NYS Office of
Children and Family Services,
SHEILA J. POOLE, Individually,
and as agents, servants and/or
employees of the NYS Office of
Children and Family Services,
ROBERTO VELEZ, Individually,
and as agents, servants and/or
employees of the NYS Office of
Children and Family Services,
JOHN DIXON, Individually, and
as agents, servants and/or
employees of the NYS Office of
Children and Family Services,
FAROUK MALLICK, Individually,
and as agents, servants and/or
employees of the NYS Office of
Children and Family Services,
and GARY B. PATTMAN,
Individually, and as agents,
servants and/or employees of
the NYS Office of Children and
Family Services,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                          OF COUNSEL:

SMALLINE, HARRI LAW FIRM                              MARTIN D. SMALLINE, ESQ.
Attorneys for Plaintiffs
100 State Street, Suite 420
Albany, NY 12207

HON. ERIC T. SCHNEIDERMAN                             KEITH J. STARLIN, ESQ.
Attorneys for Defendants                              Ass't Attorney General
Office of the Attorney General
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

## I. INTRODUCTION

Plaintiffs Charles A. Kisembo ("Kisembo"), Joseph Skabowski ("Skabowski"), and David Van Leuven ("Van Leuven") (collectively "plaintiffs") are three Youth Division Aides ("Aides") employed by the New York State Office of Children and Family Services ("OCFS") at Brookwood Secure Center ("Brookwood"), a juvenile detention facility located in Claverack, New York.

Plaintiffs contend that defendants OCFS, Acting OCFS Commissioner Sheila J. Poole ("Commissioner Poole"), current Brookwood Director Gary B. Pattman ("Director Pattman"), former OFCS Commissioner Roberto Velez ("Commissioner Velez"), former OCFS Commissioner Gladys Carrion ("Commissioner Carrion"), former Brookwood Director Farouk Mallick ("Director Mallick"), and former Brookwood Director John Dixon ("Director Dixon") (collectively "defendants") have violated their constitutional rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment.

In particular, plaintiffs' complaint alleges that in 2007 defendants enacted a use-of-force protocol that obligates Brookwood staff members facing a disturbance to exhaust non-physical options before resorting to the use of force.  According to plaintiffs, defendants continue to enforce this protocol despite knowing full well that it places staff members at increased risk of injury or death.

Defendants have moved under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure seeking to dismiss plaintiffs' complaint in its entirety.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  BACKGROUND[1]

OCFS supervises the operation of Brookwood, a juvenile detention facility that houses a population of "male individuals up to the age of 21 years old."  Compl. ¶ 21.  Because these inmates are typically "physically mature, with known violent criminal histories, including assault and murder," employees at Brookwood are "often requir[ed to use] immediate, forcible restraint to prevent [inmates] from inflicting life threatening assaults upon the staff."  Id.

On February 27, 2007, Commissioner Carrion replaced the existing use-of-force and physical restraint policies and procedures at Brookwood with a revised Protocol (the "2007 Protocol" or the "Protocol") that was "intended to limit the use of restraint to circumstances when all mandated, proactive, non-physical, behavioral management techniques had been tried and failed."  Compl. ¶ 18.

---

[1] The following facts are taken from plaintiffs' operative complaint and are assumed true for purposes of resolving the motion to dismiss.

The 2007 Protocol, which would later come to be known as the "therapeutic" or "sanctuary" model of dealing with juvenile inmates, "mandated that when the use of physical restraint is necessary, the staff shall employ only the mandated minimum amount of physical control necessary to stabilize the Juvenile Inmate in a dangerous or violent situation."  Compl. ¶¶ 19, 21.

To that end, the Protocol required Aides like plaintiffs to use "initial, proactive non-physical behavioral management [NPBM] techniques" before resorting to physical restraint.[2]  Compl. ¶ 20.  In addition, the Protocol discouraged plaintiffs and other Aides at Brookwood from using "touch controls," such as "tapping," "prodding," or other "incidental gesture[s]" when addressing, confronting, or directing juvenile inmates at the facility.  Id.

Prior to the implementation of the 2007 Protocol, Aides at Brookwood lacked "deterrent devices" but "were at least allowed to use decisive measures to physically restrain the [juveniles] when in imminent danger of violent assault."  Compl. ¶ 24.  However, after the Protocol was implemented, Aides "were no longer allowed to use decisive measures to physically restrain [inmates] when in imminent danger of violent assault."  Id. ¶ 25.

Plaintiffs allege the 2007 Protocol "has promulgated a culture of predatory behavior on the part of certain violent [inmates], who have become intimately aware of the limitations placed upon the Aides in defending themselves from unprovoked assaults that are intended to cause injury or death."  Compl. ¶ 27.  As a result, the Protocol "has caused a culture of trepidation and fear among the Aides," who are unable to defend themselves.  Id. ¶ 28.

---

[2]  Among other things, approved NPBM techniques included (1) pleasant imagery, (2) counting backwards, (3) deep breathing exercises, and (4) counseling.  Compl. ¶ 20.

The 2007 Protocol also altered how inmate-on-staff assaults were treated at Brookwood.  Compl. ¶ 33.  Before the Protocol, an inmate who assaulted an Aide or other staff member would "immediately be moved to a modified special program ("MSP") for a thirty-day period, in which there would be 24-hour supervision and he would be escorted from his unit for school, recreation, and medical care only."  Id .

Since 2007, however, "there is no such procedure" in place, "leaving the Aides vulnerable to further attack."  Compl. ¶ 35.  Further, plaintiffs allege defendants fail to abide by certain reporting regulations instituted by the Public Employee Safety and Health Bureau ("PESH") that require facilities like Brookwood to document incidents "involving physical violence against the Aides."  Id. ¶ 37.

Finally, plaintiffs allege the unsafe environment created by the 2007 Protocol has been exacerbated by OCFS's recent decision to reduce certain staffing levels at detention facilities like Brookwood.  Compl. ¶¶ 29-30.  For instance, the Special Services Unit ("SSU") staff—who were previously stationed in all common areas and hallways for immediate crisis response and to assist with all inmate movements in the hallways—were eliminated and reassigned to individual units, leaving the hallways and other common areas unprotected.  Id. ¶ 31.  According to plaintiffs' complaint, these staffing reductions occurred some time in 2016.  Id. ¶ 52.

All three plaintiffs allege that they suffered serious on-the-job injuries at the hands of violent juvenile inmates that are traceable to the changes wrought by the 2007 Protocol.[3]

---

[3]  Notably, by late 2007 certain OCFS facilities had become the subject of a U.S. Department of Justice investigation into whether on-site disciplinary practices failed to adequately protect juvenile inmates from unconstitutional uses of certain forms of physical restraint by staff members.  See G.B. v. Carrion, 486 F. App'x 886 (2d Cir. 2012) (summary order).

### A.  David Van Leuven

Van Leuven is a 280-pound, 52-year-old male who has worked as an OCFS Aide since January of 2001.  Compl. ¶ 97.  Since 2005, Van Leuven has also been qualified as a "facility-based trainer" and he is therefore familiar with the "supervision, counseling, control, and, when necessary, restraint of [inmates] within the maximum secure juvenile facilities."  Id. ¶ 99.  Van Leuven became the facility trainer at Brookwood on March 23, 2014.  Id. ¶ 97.

On December 12, 2014, at approximately 4:30 p.m., Van Leuven attempted to intervene in an argument in the hallway between a juvenile inmate and an SSU staff member.  Compl. ¶¶ 100-04.

When Van Leuven attempted to resolve the situation using NPBM techniques, a second juvenile inmate "grabbed him with a bear hug, and another [inmate], . . . hit [him] over the head, neck, and shoulder with a crutch."  Compl. ¶ 105.

Although Van Leuven "attempted to gain control of [the situation] by putting [the inmate] in a standing physical restraint, in response [the inmate] continued to hit [Van Leuven] with the other crutch, injuring his right wrist and arm."  Compl. ¶ 106.

Van Leuven was transported to the hospital, "where he was treated for a severe headache, blurred vision, and was later found to have sustained compressed and fractured vertebrae of the neck, resulting in pain and loss of movement."  Compl. ¶ 107.

As a result of this incident, Van Leuven "suffers from anxiety, sleeplessness, agitation, and post-traumatic stress."  Compl. ¶ 107.

**B.  Charles A. Kisembo**

Kisembo is a 180-pound, 60-year-old male who has worked for OCFS for over twenty years.  Compl. ¶ 39.  As a result of his two-decade tenure, Kisembo "had been trained and was experienced in all the procedures instituted by OCFS with regard to supervision, counseling, control, and, when necessary, restraint of [inmates] within the secure juvenile facilities such as Brookwood."  Id. ¶ 40.

On December 11, 2016, at around 6:30 a.m., Kisembo began his shift at Brookwood, where he was assigned as a member of the SSU staff, the "kitchen dining room staff," and the medical round staff.  Compl. ¶ 44.  At around 11:00 a.m., medical staff asked Kisembo to escort three juvenile inmates—one at a time—to the medical department.  Id. ¶ 46.

Kisembo located the first of the three inmates, who was on a "safety watch," in another part of the Brookwood facility.  Compl. ¶ 48.  According to Kisembo, this inmate was "approximately 6 feet tall, weigh[ed] approximately 200 pounds, and [was] known to have committed multiple prior assaults of Aides at Brookwood."  Id. ¶ 49.  In any event, the inmate "appeared compliant" when Kisembo first approached him, and so Kisembo and other staff member began the process of escorting the inmate to the medical department.  Id. ¶ 50.

Kisembo, the inmate, and the second staff member were about one-quarter of the way down a hallway leading to the medical department when the inmate "grabbed a pair of wet floor signs and called out [Kisembo's] name."  Compl. ¶ 54.  When Kisembo turned around and observed the inmate holding the wet floor signs, he attempted to "de-escalate the situation in a non-physical manner" in accordance with the 2007 Protocol.  Id. ¶ 56.  The

inmate ignored Kisembo's attempt at de-escalation and instead "brutally assaulted him by swinging the wet floor sign at his forehead." Id. ¶ 57.[4]

Kisembo was "shocked and dazed, blood began gushing out of his head and down his face and clothes, and he collapsed to the floor." Compl. ¶ 59. Medical staff rushed Kisembo to the hospital, where he nearly died. Id. ¶¶ 60-65.

"As a result of the brutal, near-fatal assault, [Kisembo] received twenty stitches on his forehead and now has a disfiguring scar, he experiences ringing in his ears, sleepless nights, repeatedly relives the situation, suffers from severe migraine headaches and neck pain, and has been treating with a psychologist for post-traumatic stress, a physical therapist for neck pain, and is scheduled for further treatment with a neurologist." Compl. ¶ 65. Kisembo is presently disabled. Id. ¶ 66.[5]

### C. Joseph Skabowski

Skabowski is a 227-pound, 43-year-old male who has worked as an OCFS Aide since May 31, 1998. Compl. ¶ 69. As with his fellow plaintiffs Van Leuven and Kisembo, Skabowski "has been trained and was experienced in the aforementioned Protocol instituted by OCFS with regard to supervision, counseling, control, and when necessary restraint of [inmates] within the maximum security juvenile facilities" like Brookwood. Id. ¶ 70.

---

[4] Plaintiffs' complaint adds two other facts about this encounter: first, it alleges that staffing reductions effective by this time meant that the three SSU staff members who would otherwise have been present in this hallway to provide additional security were nowhere to be found, compl. ¶ 52, and second, it alleges that before the 2007 Protocol Kisembo would have immediately used force to disarm the inmate and prevent the assault, id. ¶ 58.

[5] Plaintiffs allege Kisembo had been subjected to "other assaults" by "various" inmates prior to this incident in December of 2016. Compl. ¶ 67.

On December 31, 2016, some time after 6:30 a.m., the same inmate who had assaulted Kisembo just twenty days before "came out of his room[ and] walked down to the staff office."  Compl. ¶¶ 71-72.  When Skabowski instructed him to return to his room, the inmate refused, stated "I'm going to hit you," and then struck Skabowski "on the left side of his face, ear, and head."  Id. ¶ 73.  With the assistance of another staff member, Skabowski managed to restrain the inmate, who was handcuffed and returned to his room.  Id. ¶ 74.  Skabowski went to the emergency room, where he was treated for "an abrasion on the left side of his head and a concussion."  Id. ¶ 75.

On January 4, 2017, Skabowski was assigned to the same area of the Brookwood facility where he had recently been assaulted.  Compl. ¶ 76.  When Skabowski inevitably ran into the same inmate again, he "suffered an incidence of post-traumatic stress disorder and became anxious, pale, and dizzy and sought treatment in the emergency room."  Id.

On January 19, 2017, some time "later in the morning," a different inmate threatened to throw milk at Skabowski.  Compl. ¶ 79.  When Skabowski "explained to [the inmate] that there will be consequences and he will be written up," the inmate threw the milk at him anyway, "spit on him and then ran into the bathroom."  Id. ¶ 80.  Skabowski notified SSU staff, who escorted the inmate back to his room.  Id. ¶ 81.

A short time later, Skabowski was tasked with escorting a different inmate to the facility's activity room.  Compl. ¶ 82.  When the inmate and Skabowski were alone in the room, the inmate "took a broomstick from the corner, removed the stick from the broom, and sat at his desk holding the broomstick in a threatening manner."  Id. ¶ 83.  In addition, the inmate told Skabowski "he wanted to hit him with the broomstick."  Id. ¶ 84.  Skabowski called for assistance from the Duty Officer, who arrived and spoke with the inmate, but did

not take the broomstick away from him.  Id. ¶ 85.  After five minutes or so, two other staff members came in and took the broomstick away from the inmate.  Id. ¶ 86.

The next day, January 20, 2017, at around 6:15 a.m., Skabowski advised his Duty Officer about the threatening behavior he experienced the day before, including the milk-throwing and spitting incident.  Compl. ¶ 87.  According to the complaint, the Duty Officer rejected Skabowski's concerns, reassigned him to the same location in the facility, and stated:  "you've been here long enough, figure it out."  Id. ¶ 88.

Later that morning, the inmate who had thrown milk on Skabowski tried to throw a cup of urine at him.  Compl. ¶ 89.  Skabowski retreated to the staff office and called SSU staff and the Duty Officer for assistance.  Id. ¶ 90.  These additional staff were able to calm the inmate down and return him to his room.  Id.

Thereafter, Skabowski was tasked with escorting an inmate with a violent history to the activity room.  Compl. ¶¶ 91-92.  This inmate "became agitated because of the unavailability of recreational program" and reacted by taking a clock off the wall and breaking in on a table.  Id. ¶ 93.  Skabowski left the room and called for help from the Duty Officer and SSU staff members.  Id.

Although the staff members talked with the inmate for a couple of minutes, when they left and Skabowski returned to the activity room the inmate still "appeared very unstable."  Compl. ¶ 94.  When Skabowski "attempted to calm him," the inmate flew into an "uncontrollable rage, picked up several chairs and assaulted [Skabowski] with them, and then punched him in the face."  Id.

Skabowski was taken by ambulance to the hospital, where he was treated for "a concussion, neck pain, a lump on his left lip, back, leg, and knee injuries, marks on his chest,

back, and neck, a sprained middle finger, agitation, anxiety, sleeplessness, and

post-traumatic stress."  Compl. ¶ 95.  Skabowski is presently disabled.  Id.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  N.Y. by

Schneiderman v. Utica City Sch. Dist., 177 F. Supp. 3d 739, 745 (N.D.N.Y. 2016) (quoting

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2003)).  "The plaintiff bears the

burden of proving subject matter jurisdiction by a preponderance of the evidence."  Id. at 746

(quoting Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir.

2005)).  "In determining the existence of subject matter jurisdiction, a district court may

consider evidence outside the pleadings."  Id. (quoting Saleh v. Holder, 84 F. Supp. 3d 135,

137-38 (E.D.N.Y. 2014)).

### B.  Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be

enough to raise a right to relief above the speculative level.'"  Ginsburg v. City of Ithaca, 839

F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  "Although a complaint need only contain 'a short and plain statement of the claim

showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere

conclusions are required."  Id.  "Indeed, '[w]hile legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations.'"  Id. (quoting Ashcroft v. Iqbal,

556 U.S. 662, 679 (2009)).  "Dismissal is appropriate only where plaintiff has failed to provide

some basis for the allegations that support the elements of his claims."  Id.; see also

Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.).  In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## C. 42 U.S.C. § 1983

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992).  However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).  Thus, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law.  42 U.S.C. § 1983.

## D. Supervisory Liability

Supervisory liability "is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." Burwell v. Payton, 131 F. Supp.

3d 268, 302 (D. Vt. 2015) (citation and internal quotation marks omitted).  "It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Odom v. Matteo, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

"The personal involvement of a supervisory defendant may be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." Odom, 772 F. Supp. 2d at 403 (quoting Colon, 58 F.3d at 873); see also Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) (noting that the continued vitality of all five Colon factors remains an open question post-Iqbal).

## IV. **DISCUSSION**

Plaintiffs' complaint enumerates four pairs of 42 U.S.C. § 1983 claims based on defendants' alleged (1) "failure to implement proper protocol" (First and Second Causes of Action); (2) "failure to institute appropriate protocol to ensure safe staffing levels" (Third and Fourth Causes of Action); (3) "failure to institute appropriate protocol regarding discipline, deterrence, and security of juvenile inmates who have committed assaults" (Fifth and Sixth Causes of Action); and (4) "failure to comply with public employee safety and health bureau

protocols regarding the reporting of assaults to the detriment and harm of the plaintiffs" (Seventh and Eighth Causes of Action).[6]  Compl. ¶¶ 109-82.

Defendants' motion to dismiss identifies a laundry list of reasons that plaintiffs' complaint must be dismissed in its entirety.  Among other things, defendants assert that (A) Eleventh Amendment immunity shields the OCFS from § 1983 liability and also mandates dismissal of any official-capacity claims against the individual defendants; and (B) plaintiffs have failed to plead any cognizable violations of their due process or equal protection rights.[7]

## A. Eleventh Amendment

As an initial matter, defendants contend plaintiffs' § 1983 claims are barred by the Eleventh Amendment's guarantee of state sovereign immunity insofar as plaintiffs have asserted those claims against (1) OCFS itself; and (2) the various individual defendants in their *official* capacities.

Plaintiffs respond that defendants have failed to establish that OCFS is an "arm of the state" for purposes of the Eleventh Amendment and insist that their complaint properly invokes the narrow exception set forth in Ex parte Young, 209 U.S. 123 (1908).

"As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress."  Jackson v. Battaglia, 63 F. Supp. 3d 214, 219-20 (N.D.N.Y. 2014) (citation omitted).

---

[6]  Each of these four sets of claims attempt to pair a municipal liability claim against OCFS with an individual liability claim against Commissioner Poole, Director Pattman, Commissioner Velez, Commissioner Carrion, Director Mallick, and Director Dixon.  See Compl. ¶¶ 109-82.  Plaintiffs seek an award of compensatory and punitive damages as well as attorneys' fees.

[7]  Defendants also seek dismissal on the basis of qualified immunity, timeliness, improper service, and a lack of personal involvement on the part of any of the named defendants.

This immunity "extends beyond state agencies to state officials at those agencies working on behalf of the state (i.e. in their official capacities)." Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 406 (E.D.N.Y. 2010). Importantly for present purposes, the State of New York has not waived its sovereign immunity from § 1983 claims in federal court. See Jackson, 63 F. Supp. 3d at 220. Nor has Congress validly abrogated New York's sovereign immunity from these claims. Id.

In light of this well-settled law, plaintiffs' § 1983 claims against OCFS must be dismissed. Although plaintiffs attempt to cast doubt on whether OCFS qualifies as a state agency for immunity purposes, their own pleading identifies OCFS as "an agency of the State," compl. ¶ 7, the Second Circuit has explicitly concluded OCFS is entitled to immunity on this basis at least one occasion, Hale v. Mann, 219 F.3d 61, 73 (2d Cir. 2000), and numerous other district courts in this Circuit have subsequently endorsed that conclusion time and time again, see, e.g., Estate of M.D. v. New York, 241 F. Supp. 3d 413, 421-22 (S.D.N.Y. 2017) (finding OCFS immune from § 1983 liability as an "arm of the state"); Harder v. New York, 117 F. Supp. 3d 157, 160-61 (N.D.N.Y. 2015) ("OCFS is a New York State agency that provides services for children, families, and other vulnerable populations." (citation omitted)); Molina v. New York, 697 F. Supp. 2d 276, 283 (N.D.N.Y. 2010) (Kahn, J.) (dismissing § 1983 claims against the OCFS and an OCFS-run facility as barred by Eleventh Amendment immunity); see also Johnson v. N.Y. State Office of Child & Family Servs., 2017 WL 6459516 at *6 (N.D.N.Y. Dec. 18, 2017) (Kahn, J.) ("Plaintiff's suit against OCFS, a New York State agency, is plainly barred . . . ."); Frankel v. N.Y. State Office of Children & Family Servs., 2013 WL 10349678 at *5 (Apr. 20, 2013) (Report & Recommendation) ("OCFS is a state agency, and [plaintiff] has cited no authority that OCFS

waived its immunity under the Eleventh Amendment for claims pursuant to §

1983."), adopted as modified on other grounds by 2015 WL 1290973 (Mar. 23, 2015).  In

sum, plaintiffs have offered no legitimate reason to doubt whether OCFS qualifies as a state

agency for purposes of Eleventh Amendment immunity.  Accordingly, their § 1983 claims

against OCFS are subject to dismissal.

Plaintiffs' attempt to revive one or more of these claims by invoking the doctrine of Ex

parte Young must also be rejected.  The doctrine of Ex parte Young permits a suit to proceed

in federal court "against a state official in his or her official capacity, notwithstanding the

Eleventh Amendment, when a plaintiff (a) alleges an ongoing violation of federal law and

(b) seeks relief properly characterized as prospective."  Brown v. New York, 975 F. Supp. 2d

209, 222 (N.D.N.Y.2013) (D'Agostino, J.) (citations and internal quotation marks omitted).

But plaintiffs' prayer for relief in this case makes clear they are seeking only money

damages, not injunctive relief or a declaratory judgment.  Marino v. City Univ. of N.Y., 18 F.

Supp. 3d 320, 333 (E.D.N.Y. 2014) (observing that Ex parte Young permits suit for

"prospective injunctive relief against state officials in their official capacity").

Indeed, plaintiffs' own pleading specifically alleges that they intend to assert only

personal-capacity claims against the named defendants.  Compl. ¶ 17 ("The plaintiffs sue

each of the defendants in his, her, or its individual capacity.").  Accordingly, plaintiffs' § 1983

claims against OCFS, as well as any official-capacity claims against the individual

defendants, will be dismissed.

## B.  Due Process & Equal Protection Claims[8]

This leaves for consideration plaintiffs' § 1983 claims against the individual defendants in their personal capacities.  Plaintiffs contend these defendants "have continuously and indifferently eroded" their constitutional rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment because they "have increasingly subjected [plaintiffs] to grievous injury and death in [a] march toward more lenient and protective measures for the youth population detained in [ ] facilities [like Brookwood] regardless of their violent history."  Pls.' Opp'n at 3.[9]  According to plaintiffs, defendants' implementation and continuing enforcement of the 2007 Protocol "deprived [plaintiffs] of their fundamental right to safety and the ability to defend themselves against harm with no due process or reasoned consideration as to the danger this imposed upon them."  Id. at 3-4.

### 1.  Substantive Due Process

As defendants point out, plaintiffs fails to clearly indicate whether they are attempting to assert a *procedural* or a *substantive* due process claim.  However, plaintiffs' assertion of a due process right to "preserve their life and bodily safety," Pls.' Opp'n at 11, their invocation of "conscience-shocking" language, and their citation to the Second Circuit's analysis in

---

[8]  Defendants initially sought to dismiss a "false arrest / search and seizure" claim they identified in plaintiffs' pleading.  However, as defendants point out in their reply, plaintiffs' opposition submissions omit discussion of any such cause(s) of action and an independent review of plaintiffs' pleading reveals no facts that might support such claim(s).

[9]  Pagination corresponds to CM/ECF.

Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005), together demonstrates they seek to vindicate an alleged violation of their *substantive* due process rights.[10]

Generally speaking, "[s]ubstantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill-advised." Reyes v. Cty. of Suffolk, 995 F. Supp. 2d 215, 230 (E.D.N.Y. 2014) (citations and internal quotation marks omitted); see also Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir. 1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'").

Indeed, "[n]umerous cases in a variety of contexts recognize [substantive due process] as a last line of defense against those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible." Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980).

Importantly, however, the amorphous nature of the protections afforded by substantive due process also implicates "a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to . . . a font of tort law." Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2000) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

---

[10]   In any event, plaintiffs have failed to identify a state law property interest that might trigger procedural due process protections.  See, e.g., Meyers v. Kishimoto, 217 F. Supp. 3d 563, 577 (D. Conn. 2016) (examining procedural due process claim).  Plaintiffs' reference to state law reporting regulations imposed by PESH is insufficient.  Cusamano v. Sobek, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.").

Taking as true the facts in their complaint, plaintiffs have failed to allege that one or more of the individual defendants have engaged in any sort of "conscience-shocking" behavior that might give rise to a plausible substantive due process claim.

In particular, plaintiffs allege that Commissioner Velez and/or Commissioner Carrion, presumably along with former Directors Mallick and Dixon, implemented the 2007 Protocol at Brookwood, which explicitly endorses a "sanctuary" approach to maintaining order inside juvenile detention facilities.  Plaintiffs further allege that the Protocol has been in force continuously since that time as a result of conduct attributable to those defendants as well as to OCFS Commissioner Poole and Brookwood Director Pattman, the facility's current leadership.

Plaintiffs claim the 2007 Protocol relegates the use of physical force against juvenile inmates, including but not limited to the application of physical restraint measures, to that of a last resort rather than a first impulse.  Among other things, the Protocol requires Aides and other staff members at Brookwood to attempt proactive NPBM techniques before applying "only the mandated minimum amount of physical control necessary to stabilize the Juvenile Inmate in a dangerous or violent situation."  Compl. ¶ 19.

According to plaintiffs, the 2007 Protocol has "promulgated a culture of predatory behavior on the part of certain violent [inmates], who have become intimately aware of the limitations placed upon the Aides in defending themselves from unprovoked assaults that are intended to cause injury or death."  Compl. ¶ 27.

More recently, defendants have exacerbated the problems caused by the 2007 Protocol by reducing the levels of SSU staff inside Brookwood and by failing to properly report instances of physical violence in accordance with PESH, a state regulation.  As a

result of these changes, each named plaintiff has suffered a violent attack at the hands of one or more juvenile inmates.

But even considered in the aggregate, these factual allegations do not give rise to a claim of *constitutional* magnitude, especially since by its own terms the 2007 Protocol permits plaintiffs and other Brookwood staff members to use physical force when necessary "to stabilize the Juvenile Inmate in a dangerous or violent situation."  Compl. ¶ 19.

In fact, plaintiffs' complaint specifically alleges Van Leuven made use of physical force (albeit unsuccessfully) to attempt to restore order on at least one occasion.  Id. ¶ 106.  There is no allegation that defendants ever disciplined Van Leuven as a result of his decision to apply force or physical restraint during this encounter.  Nor is there any allegation that plaintiffs or any other Brookwood staff members were ever penalized, counseled, admonished, or reprimanded for using physical force in situations where it may have been necessary to "stabilize . . . a dangerous or violent situation."  Id. ¶ 19.

To be sure, OCFS leadership's decision to depart from the pre-2007 use-of-force regime at Brookwood and other state-run juvenile detention centers—where Aides like plaintiffs "were at least allowed to use decisive measures to physically restrain the Juvenile Inmates"—might have been an "incorrect or ill-advised" policy change.

Indeed, plaintiffs appear to believe a policy that permits more wide-ranging application of physical force to non-compliant youthful offenders would produce better results at Brookwood.  See Compl. ¶¶ 22-23 (alleging that "some" juveniles at Brookwood "posed a danger and threat equivalent to inmates with comparable backgrounds in County Jails and State Prisons" and suggesting that staff at those other detention facilities are permitted by

policy to use physical restraint more liberally); see also id. ¶ 36 (alleging the inmate who assaulted two of the named plaintiffs never received "any meaningful" discipline).

But the implementation and enforcement of the 2007 Protocol certainly does not qualify as "arbitrary, conscience shocking, or oppressive in a constitutional sense." Reyes, 995 F. Supp. 2d at 230.  That is especially so in a case like this one, where a custodial detention center like Brookwood is tasked with striking a balance between its competing obligations to protect the welfare of the juvenile inmates in its care while ensuring the personal safety of its facility staff.  Cf. Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir. 2007) (analyzing substantive due process claim in part by recognizing the alleged wrongs "were committed in aid of competing public goals that were not insubstantial").

Plaintiffs' attempt to invoke the state-created danger doctrine to save their substantive due process claims fares no better.  Compl. ¶ 116.  Although "a State's failure to protect an individual against private violence [generally] does not constitute a violation of the Due Process Clause.  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989), "the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim," Matican v. City of N.Y., 524 F.3d 151, 155 (2d Cir. 2008).  In other words, "[w]here a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages." Lombardi, 485 F.3d at 80.

Again, plaintiffs focus on defendants' alleged failure to take corrective action in the face of a known, dangerous environment that existed inside Brookwood.  But the state-created danger doctrine is inapplicable in this case because plaintiffs merely allege a generalized danger posed by a segment of the population as opposed to an increased risk of

harm posed by an identifiable third party that can be traced in a fairly specific manner to some aspect of defendants' conduct.  Cf. Reid v. Freeport Public Sch. Dist., 89 F. Supp. 3d 450, 459 (E.D.N.Y. 2015) ("[T]he state-created danger theory does not impose a duty on [schools] to protect students form assaults by other students, even if Defendants knew or should have known of the danger.").

In essence, plaintiffs allege defendants violated their substantive due process right to a "safe working environment" inside Brookwood.  But that is a theory of constitutional liability that has already been explicitly rejected by no less an authority than the Supreme Court itself.  See Collins v. Harker Heights, 503 U.S. 115, 125-29 (1992) (rejecting as "unprecedented" the claim that the Due Process Clause "guarantee[d] municipal employees a workplace that is free of unreasonable risks of harm").  Accordingly, plaintiffs' complaint fails to state a claim for violation of substantive due process.

### 2. Equal Protection

Plaintiffs also assert an equal protection claim "based upon the disparate treatment of those similarly situated within the Brookwood facility."  Pls.' Opp'n at 10.  According to plaintiffs, "[b]oth the plaintiffs and the Juvenile Inmates of Brookwood are similarly situated since they cohabit at the facility together on a daily basis, and both depend upon the policies and protocols of the OCFS and the individual defendants' administration of them to protect the life and survival of each within the confines of the facility."  Id.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This constitutional provision is "essentially a direction that all persons

similarly situated be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S.

432, 439 (1985).

There are a number of common methods for pleading an equal protection claim.  First,

"[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of

race.'"  Floyd v. City of New York, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting Brown

v. City of Oneida, 221 F.3d 329, 337 (2d Cir. 1999)).  Second, "a plaintiff could identify a

facially neutral law or policy that has been applied in an intentionally discriminatory

manner."  Brown, 221 F.3d at 337 (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886)).

Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse

effect and that it was motivated by discriminatory animus."  Floyd, 959 F. Supp. 2d at 570

(citation omitted).

With respect to these first three theories, a plaintiff "generally need not plead or show

the disparate treatment of similarly situated individuals."  Pyke v. Cuomo, 258 F.3d 107,

108-09 (2d Cir. 2001); see also Doe, 462 F. Supp. 2d at 546 (observing that courts have

dispensed with the "similarly situated group" requirement in cases where the "differential

treatment of the target group could otherwise be clearly demonstrated").

In this case, there is no indication that plaintiffs are members of an inherently suspect

or vulnerable class and therefore these first three theories of relief are inapplicable to their

claims.  But these are not the only ways to plead an equal protection violation.

For instance, pursuant to Le Clair v. Saunders, 627 F.2d 606 (2d Cir. 1980) a plaintiff

may also assert a "selective enforcement" claim by showing they were treated differently

"based on impermissible considerations such as race, religion, intent to inhibit or punish the

exercise of constitutional rights, or malicious or bad faith intent to injure a person." Savino v. Town of Southeast, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013).

Alternatively, pursuant to Village of Willowbrook v. Olech, 528 U.S. 562 (2000), an equal protection plaintiff may assert a so-called "class of one" claim by alleging that "they were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment." Doe, 462 F. Supp. 2d at 558.

Whether plaintiffs attempt to pursue a "selective enforcement" or a "class of one" equal protection claim, either theory "require[s] a showing of similarly situated individuals or groups who were treated differently." Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).

In light of these standards, the facts alleged in plaintiffs' complaint simply do not give rise to any sort of plausible equal protection claim. A review of the complaint confirms that plaintiffs do not allege they were treated differently than other Aides or other staff members inside Brookwood.

Nor do they allege that other secure facilities operated by OFCS were governed differently with respect to the 2007 Protocol, permitted to deal with use-of-force matters in another way, or that other juvenile detention centers enjoyed better staffing levels or higher rates of compliance with state law reporting requirements.

To the contrary, plaintiffs' complaint alleges that the 2007 Protocol has been applied consistently and continuously to govern use-of-force rules and physical restraint procedures for all staff at Brookwood and, apparently, for the other secure juvenile detention centers operated by OCFS across New York State.

Plaintiffs instead base their equal protection claim on an argument that they are similarly situated to the juvenile inmates themselves for purposes of advancing these constitutional claims.  Pls.' Opp'n at 10.  This argument is rejected.  To be sure, the "similarly situated" requirement does not obligate the plaintiffs to identify a perfect match.  See Savino, 983 F. Supp. 2d at 305; see also Vill. of Wesley Hills, 815 F. Supp. 2d at 693-97 (explaining that the "similarly situated" test is even less demanding in the "selective enforcement" context than it is for "class of one" claims).  But it does at least demand that "a prudent person would think them roughly equivalent." Estate of Morris v. Dapolito, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) (citation omitted).  "In other words, apples should be compared to apples." Id. (citation omitted).

No prudent person would think that Aides or security staff members (like plaintiffs) at a juvenile detention center (like Brookwood) are "similarly situated" to the juvenile inmates those same staff members are charged with guarding, supervising, and protecting.

After all, the difference in treatment plaintiffs identify as relevant between these two groups is that staff at Brookwood (as state employees) are subject to use-of-force restrictions imposed by OCFS (as state employer), while the juvenile inmates in their custody are not.  Cf. Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 599 (2008) ("[G]overnment has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.").  It is completely implausible to suggest that this kind of differential treatment triggers any degree of constitutional scrutiny.  Accordingly, plaintiffs' equal protection claims will be dismissed.

## V. **CONCLUSION**

Plaintiffs have failed to plausibly allege that the implementation and enforcement of the 2007 Protocol, a reduction in staffing levels, and/or the violation of certain state law reporting requirements gives rise to viable § 1983 claims based on substantive due process or equal protection.  Although these conclusions are sufficient to resolve the pending motion to dismiss, it bears noting that defendants' additional arguments—based on timeliness, improper service, lack of personal involvement, and even qualified immunity—would be likely to provide one or more independent bases for dismissal as well.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss is GRANTED; and

2.  Plaintiffs' complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

Dated:  February 1, 2018
        Utica, New York.

_____
United States District Judge